1
2
3
4
5
6
7
8            **UNITED STATES DISTRICT COURT**
9            **SOUTHERN DISTRICT OF CALIFORNIA**
10

11   ELIZABETH BLAJ, an individual; and            CASE NO. 09cv0734-LAB (RBB)
     SANDRA ROMERO, an individual,
12                                                 **ORDER ON SUMMARY**
                                    Plaintiffs,    **JUDGMENT**
13          vs.

14   STEWART ENTERPRISES, a business
15   entity; EL CAMINO MEMORIAL PARK &
     MORTUARY, a California business
16   entity; and ELLIOT STEIN, an individual;
     and DOES 1 through 25, inclusive,
17
                                    Defendants.
18

19          Plaintiffs Blaj and Romero are a daughter and mother who were previously employed

20   at a mortuary operated by Defendant Stewart Enterprises.  Blaj sold funeral merchandise

21   and services, and Romero was a cosmetologist.  They were both fired in early February

22   2009, Blaj first and Romero one week later.  Blaj alleges that she was fired because she

23   had, or was perceived to have, a disabling liver condition.  Romero alleges that she was fired

24   because of her relation to Blaj. Now before the Court is Stewart's motion for summary

25   judgment.

26   **I.      Factual Background**

27          Blaj has had liver problems since 1999, and in 2006 she learned that she would need

28   a liver transplant.  Her physician at the time referred her to the liver transplant center at

1   Scripps Hospital, where she saw Dr. Donald Hillebrand.  It was around this time that Stewart

2   learned of Blaj's illness, because her condition required her to take four weeks off of work.

3        On May 1, 2007, Stewart switched insurance carriers from United Healthcare to

4   CIGNA.  The employees were notified of the change by a memo distributed on February 2,

5   2007.  Scripps Hospital, unfortunately, was not in CIGNA's network.  This was a problem for

6   Blaj because she'd been seeing Dr. Hillebrand at Scripps for some time and had decided,

7   in April or May of 2007, to undergo a liver transplant there — probably because she was

8   satisfied with the care she was receiving at Scripps and because United Healthcare was

9   covering it.

10       In June 2007, once Blaj was insured under Stewart's plan with CIGNA, she was

11  referred to a case manager named Susan Sananikone.  Sananikone, upon receiving a

12  request from Scripps for coverage for Blaj, filed a request on Blaj's behalf for out-of-network

13  coverage, asking CIGNA to cover Blaj's ongoing care there.  The request was denied on

14  June 27, 2007.  CIGNA covers only those transplants performed by facilities that it has

15  designated a "LifeSOURCE Center of Excellence," and Scripps lacks that designation.

16       On July 5, 2007, Sananikone spoke with Blaj and directed her to other LifeSOURCE

17  facilities where Blaj could receive treatment covered by CIGNA.  One of those facilities was

18  the University of California at San Diego, and Blaj indicated an interest in receiving

19  treatment, and, eventually, a liver transplant there.  By mid-August, she had been in touch

20  with UCSD's transplant team and  appeared to be in the process of having the necessary

21  medical records forwarded from Scripps to UCSD.  Unfortunately, UCSD did not perform

22  transplants from living donors, which was the method Blaj preferred.  On September 20,

23  2007, Blaj informed her new case manager, Colleen Carver, that she was not comfortable

24  with the atmosphere at UCSD and wished to pursue treatment elsewhere.  Carver told her

25  Stanford and UCLA were LifeSOURCE facilities and that they performed live donor

26  transplants.  She also told Blaj that CIGNA would cover Blaj's travel and lodging if she chose

27  to pursue treatment outside of the San Diego area.

28  //

1    Around this same time, in early August 2007, Blaj communicated to Elliot Stein, a
2  Stewart employee relations manager, her dissatisfaction that a transplant at Scripps wouldn't
3  be covered by CIGNA.  Both Stewart and Blaj acknowledge that Stein pledged his support.
4  According to Stewart, however, Blaj proved difficult to help, primarily because she would not
5  return her case manager's phone calls.  According to Blaj, she stayed in continual touch with
6  Stein and received every assurance that he was working on her behalf; she was never under
7  the impression that remaining in touch with CIGNA was her responsibility.  The record does
8  show that Stein contacted Kathy Richeson at Stewart's corporate office on Blaj's behalf, and
9  that through August and September of 2007 Richeson was in communication with a
10  representative at CIGNA in an attempt to continue Blaj's treatment at Scripps under the
11  CIGNA plan.

12    CIGNA upheld its denial of out-of-network coverage on September 26, 2007.  Blaj had
13  the option then to pursue a second appeal[1] or submit a request from Dr. Hillebrand for out-
14  of-network coverage based on a medical necessity, and she did neither.  But she did contact
15  Carver on October 16 to inquire whether Stanford University and the University of California
16  at San Francisco were within CIGNA's network such that she could pursue a live donor
17  transplant at either institution.  She was told they were, but according to Stewart, CIGNA did
18  its best to assist with a referral to Stanford and Blaj was essentially non-responsive for a
19  period of several months.  In mid-January 2008 Carver was finally able to reach Blaj; Blaj
20  told her she was still interested in receiving a transplant at Stanford, and Carver gave her
21  instructions for initiating a consultation.  Blaj completed her consultation at Stanford in early
22  March 2008.  She was approved for a live donor transplant and placed on a transplant
23  waiting list.

24    In late September 2008, Blaj approached Stein and told him she was considering
25  seeing an attorney on the ground that Stewart provided so little help to Blaj over the past
26  year that it was responsible for the coverage conundrum she found herself in.  But then Blaj
27  became seriously ill and was admitted to the intensive care unit at Scripps, where she was
28

---

[1] Scripps submitted the first appeal on Blaj's behalf.

1    placed at the top of the list for a liver transplant.  Dr. Hillebrand filed a request with CIGNA,
2    based on Blaj's life-threatening condition, that CIGNA cover the surgery.  CIGNA's medical
3    director, finally, approved the request and Blaj underwent liver transplant surgery at Scripps
4    on October 15, 2008.

5         Blaj returned to work at the mortuary operated by Stewart in January 2009, after she
6    had recovered from the transplant surgery.  But in early February she was fired, ostensibly
7    for violating a company conflict-of-interest policy.  As Stewart tells it, Blaj referred a Stewart
8    customer to a third-party vendor to purchase a grave marker and acted as a liaison between
9    the two, in direct contravention of a company policy that forbids direct referrals.  Stewart also
10   suggests that Blaj had already received a final written warning for other work-related
11   misconduct, but it's not clear from the record what the misconduct was.  Approximately one
12   week after Blaj was terminated, Romero was terminated.  The stated justification for
13   Romero's termination was a reduction in force.

14   **II.    Blaj's Claims**

15        Blaj initially brought four claims against Stewart.  The first alleged wrongful termination
16   in violation of public policy.  The second alleged a hostile work environment.  The third and
17   fourth alleged, respectively, the negligent and intentional infliction of emotional distress.

18        Blaj concedes there is insufficient evidence to support the hostile work environment
19   claim.  (Opp'n Br. at 16.)  That claim is therefore **DISMISSED**.

20        She also concedes — and the Court will defer to her judgment — that the emotional
21   distress claims are preempted by ERISA.  (Opp'n Br. at 14.)  Those claims are also
22   **DISMISSED**.  But Blaj attempts to repackage them under the ERISA statute 29 U.S.C. §
23   1140, which makes it unlawful to discharge an employee "for exercising any right to which
24   he is entitled under the provisions of an employee benefit plan."  Blaj is, in essence,
25   attempting to convert her emotional distress claims into a second wrongful termination claim,
26   based on her pursuit of coverage for her liver transplant from CIGNA: "Further the discharge
27   in retaliation for her exercise of an ERISA plan right is not pled in those terms, rather it is
28   pled by state law claims that are indeed preempted by ERISA."  (Opp'n Br. at 16.)

1    There are a couple of problems here.  First, the conversion is not a smooth one.  The

2    claims have different factual predicates, so an ERISA-based retaliatory discharge claim is

3    hardly the emotional distress claims by a different name.   The heart of Blaj's  emotional

4    distress claims was Stewart's alleged foot-dragging in helping Blaj obtain coverage from

5    CIGNA for a liver transplant at Scripps.[2]  (Compl. ¶ 44.)  The retaliatory discharge claim, by

6    contrast,  alleges that Blaj attempted to avail herself of medical benefits under the CIGNA

7    plan and was fired for doing so.  In the portion of her opposition brief devoted to the ERISA-

8    based retaliation claim, Blaj repeats her alleges that Stewart said it would help her obtain

9    CIGNA's approval to have a liver transplant at Scripps but then failed to keep her in the loop

10   about its progress (or lack thereof).  (Opp'n Br. at 15.)  But this was the basis of the

11   emotional distress claims that Blaj now concedes are preempted, and it is irrelevant to the

12   retaliatory discharge claim she now wishes to plead in their place.

13   Second, Blaj is inconsistent as to what she is alleging Stewart fired her *for*.  Initially,

14   it's the mere fact that she sought coverage from CIGNA for a liver transplant at Scripps.

15   (Opp'n Br. at 14:24–25.)  But later, it's the fact that Blaj threatened to hire an attorney to

16   pursue legal action against Stewart.[3]  (Opp'n Br. at 15:26–27.)  And finally, Blaj alleges that

17   Stewart "desire[d] to distance itself from Blaj after [it] negligently handled Blaj's relationship

18   with CIGNA," which doesn't even sound like an allegation of retaliation.  (Opp'n Br. at

19   16:4–6.)  In any event, Blaj's attempt to re-brand her emotional distress claims as wrongful

20   //

21

_____

22   [2] In fact, even as pleaded, Blaj's emotional distress claims suffer a lack of focus and
precision.  What was it that caused the distress?  Stewart's failure to lobby CIGNA on Blaj's

23   behalf, after Stein allegedly promised he would?  (Opp'n Br. at 3.)  Or Stein's failure to
submit a "Transition of Care" form to United Healthcare, in the very beginning, that would

24   have allowed Blaj to continue her treatment at Scripps and saved her the trouble of seeking
out alternative treatment facilities?  (Compl. ¶ 20.)  Or was it Stein insisting that Blaj return

25   to work sooner than her physician advised, an allegation that makes its way into Blaj's
complaint but has no apparent tie-in to any of her claims?  (Compl. ¶ 24.)

26

27   [3] It's not even clear to the Court that firing Blaj for seeking legal advice is actionable
under the ERISA statute on which her retaliatory discharge claim is based.  That statute

28   protects the exercise of rights to which an employee is entitled "under the provisions of an
employee benefit plan," and Blaj's right to seek out counsel seems to be just a general right
she has as a citizen, not one that is conferred by the CIGNA plan.

1  discharge claims under ERISA is, as the Court sees it, an attempt to amend her complaint
2  to add an ERISA claim.

3      As Stewart rightly argues, it isn't a given that, at this stage in the litigation, Blaj can
4  amend her complaint to add new claims — especially when her medium for doing so is a
5  brief opposing summary judgment that was filed after the deadline for amendments specified
6  in the Court's scheduling order *and* after the close of discovery.  *See, e.g.*, *Lamon v.*
7  *Director*, S-06-0156, 2010 WL 3448593 at *7 (E.D. Cal. Sept. 1, 2010) ("Plaintiff cannot use
8  his opposition to a motion for summary judgment, filed long after the answers were filed in
9  this case, as a vehicle to further amend his complaint to raise additional claims.") Blaj has
10  had more than enough time to face the facts as they've been developed in discovery and ask
11  for the Court's permission to amend her complaint, and she hasn't done so.  It's not fair to
12  Stewart to present it with claims it hasn't had the opportunity to investigate, answer, and take
13  discovery on.

14      Cutting against this somewhat, the Ninth Circuit has held that "when a party raises a
15  claim in materials filed in opposition to a motion for summary judgment, the district court
16  should treat the filing as a request to amend the pleadings and should consider whether the
17  evidence presented creates a triable issue of material fact."  *United States ex rel. Schumer*
18  *v. Hughes Aircraft Co.*, 63 F.3d 1512, 1524 (9th Cir. 1995). The Court is inclined to follow
19  *Hughes Aircraft*, if only because Stewart appears willing to confront the claim head-on and
20  does not view Blaj's attempt to rebrand her emotional distress claims as an attempt to
21  amend her complaint.  (Reply Br. at 1:18–19.) Blaj therefore has two claims against Stewart.
22  The first, for wrongful termination in violation of public policy, alleges that Stewart fired Blaj
23  because of her medical condition.  The second claim is for wrongful retaliation under ERISA.

24  **III.   Summary Judgment Standard**

25      Summary judgment is appropriate where "there is no genuine issue as to any material
26  fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P.
27  56(c).  As the moving party, it is Stewart's burden to show there is no factual issue for trial.
28  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To meet this burden, Stewart show that

1    Blaj lacks evidence to support her case. *Id.* at 325. If it makes that showing, Blaj must go

2    beyond the pleadings and set forth "specific facts" to show a genuine issue for trial. *Id.* at

3    324.

4         The Court considers the record as a whole and draws all reasonable inferences in the

5    light most favorable to Blaj. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th

6    Cir. 2000). The Court may not make credibility determinations or weigh conflicting evidence.

7    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Rather, the Court determines

8    whether the record "presents a sufficient disagreement to require submission to a jury or

9    whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. Not

10   all alleged factual disputes will serve to forestall summary judgment; they must be both

11   material and genuine. *Id.* at 247–49. "If conflicting inference may be drawn from the facts,

12   the case must go to the jury." *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir.

13   2000) (citations omitted).

14   **IV.    Blaj's Wrongful Discharge Claim**

15        **A.    Preemption**

16        Stewart argues, first, that Blaj's wrongful discharge claim is pre-empted by ERISA

17   because the claim is related to an employee benefit plan. ERISA "supersedes any and all

18   State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ."

19   29 U.S.C. § 1144(a). This preemption clause is one of the broadest ever enacted by

20   Congress. *San Francisco Culinary, Bartenders and Serv. Employees Welfare Fund v. Lucin*,

21   76 F.3d 295, 298 (9th Cir. 1996) (internal quotations omitted). The Court disagrees,

22   however, that it reaches as far as an employee's claim that she was wrongfully terminated

23   on account of a medical condition.

24        A state law claim is related to an employee benefit plan if it is "premised on the

25   existence" of one, or if the existence of the plan "is essential to the claim's survival."

26   *Providence Health Plan v. McDowell*, 385 F.3d 1168, 1172 (9th Cir. 2004). This simply

27   cannot be said of a claim that an employer wrongfully terminated an employee on account

28   of her medical condition. The law on which that claim is based governs, strictly, the

1   relationship between employers and employees; it has no connection with or reference to

2   ERISA plans.  *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983); *see also*

3   *Chasan v. The Garrett Group*, No. 06-CV-1090, 2007 WL 173927 at *7 (S.D. Cal. Jan. 18,

4   2007).  Blaj may have sought coverage from an ERISA plan for treatment for the medical

5   condition that she alleges inspired her unlawful termination, but it is the mere fact that she

6   was ill that she alleges caused Stewart to terminate her employment.  (Compl. ¶ 28.)

7        Stewart relies on *Ramer v. Southern California Gas Company*, 6 Fed.Appx. 577 (9th

8   Cir. 2001), but the case cannot do the work that Stewart needs it to.  *Ramer* does

9   contemplate that a wrongful termination claim may be preempted by ERISA, but only when

10  "the employee alleges that a principal reason for his discharge was his employer's desire to

11  avoid paying him benefits under an ERISA plan."  *Id.* at 579.  ERISA won't preempt a

12  wrongful termination claim, however, "to the extent it relies on theories independent of the

13  benefit plan."  *Id.* (internal quotations omitted).  Even if *part* of what motivates Blaj's wrongful

14  termination claim is her suspicion that Stewart wanted to eliminate the costs of having a

15  sickly employee on its health insurance plan, it's clear from the complaint that one theory

16  behind Blaj's wrongful termination claim is that Stewart thought her job performance had

17  suffered and would continue to suffer on account of her liver condition.  This is why Blaj

18  places so much emphasis, for example, on Elliot Stein's memo in which he said, "[Blaj] has

19  a documented medical condition that effects some aspects of her job."  (Opp'n Br. at 3, 10,

20  11.)  Insofar as Blaj's wrongful termination claim alleges that Stewart fired her because of

21  her medical condition, the claim is not preempted by ERISA.

22       **B.    Anatomy of the Analysis**

23       California has adopted the three-stage burden-shifting test for employment

24  discrimination claims set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

25  *Sandell v. Taylor-Listug, Inc.*, 188 Cal.App.4th 297, 307 (Cal. Ct. App. 2010).  First, the

26  plaintiff must present sufficient evidence to establish a prima facie case that she was the

27  victim of discrimination.  If she can do that, a presumption of discrimination arises and the

28  burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for the

allegedly discriminatory act. *Id.* at 307–308. Assuming the employer sustains this burden, the presumption of discrimination evaporates and the burden shifts back to the plaintiff to offer additional evidence that the employer's proffered reason is a pretext for discrimination. *Id.* at 308.

### 1. Blaj's Prima Facie Case

The requirement that a plaintiff alleging discrimination establish a prima facie case "is designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified, or where the job . . . was withdrawn and never filled." *Id.* at 307. The burden here is a light one; minimal evidence suffices to satisfy it. *Id.* at 310. A plaintiff can meet the burden in a disability discrimination case with either direct or circumstantial evidence that: (1) she suffered from a disability, or was perceived to suffer from one; (2) she could perform the essential duties of the job with or without accommodations; and (3) she was terminated because of the disability, actual or perceived. *Id.* The evidence need only allow for a reasonable inference of discrimination. *Id. See also Jensen v. Wells Fargo Bank*, 85 Cal.App.4th 245, 255 (Cal. Ct. App. 2000) (citing *Brundage v. Hahn*, 57 Cal.App.4th 228, 236 (Cal. Ct. App. 1997)).

There is no doubting that Blaj suffered a liver-related illness and that Stewart knew she did. (*See, e.g.*, Blaj Dep. 66:9–23.) Blaj's ability to handle the basics of her job selling funeral merchandise and services for Stewart also appears not to be in dispute. Finally, Blaj was terminated by Stewart within one month of returning to work after recovering from a liver transplant — and just a few months after a drawn-out and ostensibly acrimonious back-and-forth between Blaj and Stewart regarding CIGNA's willingness to cover her medical treatment at Scripps. Viewing this evidence in the light most favorable to Blaj, there is enough to support the inference that Stewart discriminated against her on the basis of her medical condition.

### 2. Stewart's Rebuttal

To rebut the presumption that its termination of Blaj was discriminatory, Stewart explains that she violated its conflict of interest policy. (Stein Dep. 15:11–16:14 and

25:5–25; Madigan Dep. 34:14–25.)  Specifically, as Stewart explains it, Blaj "referred an STEI customer to an outside vendor to purchase a grave marker and acted as a liaison between the customer and the outside vendor, which was prohibited under the policy." (Opp'n Br. at 11.)  Blaj admits to most of this.  (Blaj Dep. 182:11-188:11.)

What isn't clear, at least to the Court, is whether Blaj's conduct was a plain violation of Stewart's policies, a borderline transgression, or something in between.  For example, Ken Stephens, in his deposition, used the word "clearly" and the phrase "without any doubt" when asked if Blaj's referral of clients to an outsider vendor created a conflict of interest. (Stephens Dep. 15:22–17:1.)  But Stein testified that "it was . . . the perception of the company that what [Blaj] did was a conflict of interest" and that Stewart "believed it to be a conflict."  (Stein Dep. 22:8–24:17.)  Arguably, Stein's words imply that the propriety of Blaj's conduct was open to some interpretation.  The section of Stewart's Employee Handbook devoted to "Conflicts of Interest" is about 5 pages long, and it does not specifically address Blaj's conduct.

In any event, the violation of company policy is a perfectly legitimate reason for firing an employee, so the burden returns to Blaj to show that this proffered reason for her termination is a pretext for discrimination.  *Sandell*, 188 Cal.App.4th at 308.

### 3.   Blaj's Additional Evidence

Blaj can do this in one of two ways.  First, she can point to direct evidence that Stewart acted with a discriminatory motive.  *Id.*  Alternatively, because direct evidence of intentional discrimination is so rare, she may attack Stewart's proffered reason as inconsistent or not believable.  *Id.* at 308, 314.  "In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias."  *Id.* at 308.  It isn't enough to argue that Stewart made a bad or unwise decision in her case, "since the factual dispute at issue is whether *discriminatory animus* motivated [Stewart]."  *Id.* at 314 (internal quotations omitted) (emphasis added).  Rather, Blaj "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Stewart's] proffered legitimate reasons

1   for its action that a reasonable fact finder could rationally find them unworthy of credence."

2   *Id.* (internal quotations omitted).

3         Blaj goes both routes.  She presents some arguably direct evidence that Stewart did

4   act with a discriminatory motive, and she presents other evidence to suggest that Stewart's

5   proffered reason for the termination doesn't hold water.

6         The first piece of direct evidence is that Eliot Stein, in an April 2, 2008 email, wrote

7   that "Liz has a documented medical condition that effects some aspects of her job." (*See*

8   Opp'n Br. at 11; Gienap Decl., Ex. 2.)  The second is that "other Family Service Counselors

9   were complaining to Blaj's supervisors about Blaj using the medical condition to relate to and

10  sell to customers."  (Opp'n Br. at 9.)  The Court isn't inclined to recognize either for the

11  purpose of Blaj's complaint surviving summary judgment.  Stein's comment about Blaj's

12  medical condition is excerpted entirely out of context.  The email betrayed no hostility to Blaj

13  and was in fact sympathetic to her.  It was sent to Marie Johnson, Blaj's manager, and its

14  purpose was to encourage Johnson to "give [Blaj] the necessary tools, guidance, and

15  support to help her succeed in her position." (Gienap Decl., Ex. 2.)  That is hardly evidence

16  that Stewart had it out for Blaj because of her illness; in fact, it carries the opposite

17  implication, namely that Stewart was aware of Blaj's condition and committed to working with

18  her in spite of it.  Perhaps it shows that Stewart was *aware* of Blaj's condition, which is of

19  course an element of Blaj's discrimination claim, but Stewart's awareness of Blaj's condition

20  isn't in dispute.

21        The Court also makes little of Blaj's allegation that her co-workers were complaining

22  about her capitalizing on her illness for the purpose of relating to customers.  (*See* Bongard

23  Decl. ¶ 7.)  Even if that's true, and even if these complaints factored into the decision to

24  terminate Blaj (the Court has no evidence), the allegation relates to Blaj's *sales tactics*, which

25  the Court doubts are protected under the Fair Employment and Housing Act even if an

26  employee's underlying medical condition is.

27        Having rejected Blaj's purported direct evidence of discrimination as impertinent, the

28  Court turns to her evidence that Stewart's proffered reason for her termination isn't

believable.  First, Blaj argues that prior to her illness she was a model employee and one of Stewart's highest-grossing salespeople.  (Opp'n Br. at 2; Blaj Decl. ¶ 4.)  Second, she argues that "there are at least two other family service counselors who violated the same conflict of interest policy as Blaj and were not terminated and in one case not disciplined." (Opp'n Br. at 10.)  Third, Blaj claims that when she was confronted about violating Stewart's policies on January 26, 2009, she was told she would not be disciplined, that her conduct fell in a "gray area," and that it was the proper subject of further training for Stewart's sales staff.  (Compl. ¶ 25.)  Fourth, Blaj suggests there is no consensus on who terminated Blaj or how the decision was made.  (Opp'n Br. at 10.)  Fifth, Blaj asserts that Stein knew some of Blaj's peers wanted her fired and were falsely accusing her of "profiting from outside transactions."  (Opp'n Br. at 9.)

The last two items are simply unavailing.  The fact that there's no consensus on *who* terminated Blaj or *how* the decision was made says nothing about authenticity of the reason given by Stewart for Blaj's termination — the *why* of the termination.  And the fact that Blaj's peers had it out for her and accused her of engaging in "outside" transactions only buffers Stewart's stated justification for her termination, even if the termination was unreasonable or unfair.  It certainly doesn't suggest that the justification was a pretext, nor does it suggest that Stewart's justification was in fact inspired by her medical condition.  That leaves Blaj's past job performance, her comparison to other similarly-situated employees, and the "gray area" allegation as the most she has to attack Stewart's proffered reason for her termination. The first two of these, incidentally, are typical of the kinds of kinds of circumstantial evidence used to show an employer's attempt to retaliate unlawfully against an employee.  *See Colarossi v. Coty US Inc.*, 97 Cal.App.4th 1142, 1153 (Cal. Ct. App. 2002).

Blaj received sales awards in 2005, 2006, and 2007, and she was singled out for recognition in 2006.  (Blaj Decl. ¶ 4.)  In and of itself, this fact could not defeat summary judgment, even if in other employment retaliation cases it cuts heavily in a plaintiff's favor. The fact is that Stewart's stated justification for Blaj's termination had nothing to do with how good of a salesperson she was, but rather with her observance of company policy.  In

addition, Blaj was fired in early 2009, allegedly for conduct that occurred in late 2008.  Blaj would even concede that after 2007, leading up to her October 2008 liver transplant, her job performance suffered.  (Blaj Decl. ¶ 3.)  Stewart convened a meeting in April 2008 to address just this. (Gienap Decl. ¶ 3.)  Blaj's solid performance in the past may support the accusation that Stewart's termination of her employment was unwise, but alas, what's unwise isn't unlawful.  *See Sandell*, 188 Cal.App.4th at 314.

Blaj's allegation that other Stewart employees — Rebecca Melendez and Rose Tran — violated the conflicts policy and were not terminated is a serious one.  It cuts to the heart of Stewart's legal defense, and has the power, unrebutted, to give rise to precisely the kind of conflicting inference that requires claims to be sent to a jury.  But the matter is hardly as simple as Blaj would like it to be.

Rebecca Melendez did indeed receive only a verbal disciplinary warning for her involvement in the transaction that ostensibly led to Blaj's termination, but on Stewart's telling Melendez's role was a minor and borderline exculpatory one. (*See* Stein Dep. 27:7–15; 2d Stein Decl. ¶¶ 2–4.)  On top of that, Blaj's alleged violation of Stewart's conflicts policy was not her first infraction on the job; she'd been previously disciplined which, according to Stewart, distinguished her from Melendez and weighed in favor of termination. (Stein Dep. 23:7–14 and 29:7–14.)  This certainly lessens the nefarious inferences one may draw from the differential treatment of Blaj and Melendez.  It may allow a reasonable person to conclude that Stewart came down especially hard on Blaj, but that's not the same thing as being motivated by discriminatory animus.   Employers are allowed to react severely, and indeed, to *over*react, to the transgressions of at-will employees.  The Court therefore attaches some, but not much, significance to Stewart's allegedly disparate treatment of Melendez.

Blaj also alleges that Rose Tran violated Stewart's conflicts policy, frequently, openly, and with impunity.  The sole basis for this is Bongard's sparse testimony that "Rose Tan, another salesperson who still works at Stewart, violates this outside vendor policy all the time.  She does so openly and it is well known she does." (Bongard Decl. ¶ 6.)  Though

there may be some truth to Bongard's testimony — Tran was, after all, fired for referring a customer to an outside mortuary well after Blaj initiated this case (2d Stein Decl. ¶¶ 5–8) — the Court is tempted to disregard it because Blaj failed to identify Bongard as a witness until months after the close of discovery in this case.  (See Doc. No. 39 n. 2.)  A case management order entered on May 15, 2009 provided that "[a]ll discovery shall be completed by all parties on or before <u>February 8, 2010</u>."  (Doc. No. 7 ¶ 1.)  It also warned that "failure to comply with expert discovery or any other discovery order of the Court may result in the sanctions provided for in Fed. R. Civ. P. 37 including a prohibition on the introduction of experts or other designated matters in evidence."  (*Id.* at ¶ 2.)  The Federal Rules allow for parties to supplement their Rule 26(a) disclosures, *see* Fed. R. Civ. P. 26(e), but Blaj did not attempt to do that.  She just sprung Bongard's declaration on Stewart in her opposition to its summary judgment motion.[4]

  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Here, the failure is certainly not harmless; it surprises Stewart with relevant witness testimony at a stage in the litigation when Stewart cannot cross examine that witness.  Moreover, the testimony is testimony Stewart could not have seen coming, and it is quite advantageous to Blaj.  This is precisely the kind of late and opportunistic disclosure of evidence that Rule 37 forbids.  *Cf. Ashman v. Solectron, Inc.*, No. CV 08-1430, 2010 WL 3069314 at *4 (N.D. Cal. Aug. 4, 2010) (allowing supplemental disclosure of witness testimony after close of discovery when witness was likely and testimony was foreseeable).  The wholesale exclusion of undisclosed witness testimony from the evidentiary record on summary judgment may seem severe, but the Court also has an interest in seeing its cases

---

  [4] Blaj argues that "[a]t no time have the parties exchanged or been ordered to exchange supplemental disclosures" (Doc. No. 44 n. 2) but Rule 26(e) requires a party to supplement its Rule 26(a) disclosure "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A).

1   to an efficient resolution that is undermined when parties don't observe deadlines.[5]  *Wong*

2   *v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1060 (9th Cir. 2005) ("Parties must

3   understand that they will pay a price for failure to comply strictly with scheduling and other

4   orders, and that failure to do so may properly support severe sanctions and exclusion of

5   evidence.").

6       It is slightly tempting to accord some weight to Bongard's testimony considering that

7   Stewart corroborates part of it — the *fact* that Tran violated its conflicts policy — but the

8   timing of the testimony is suspicious.  Stewart presents evidence that it learned of Tran's

9   transgression on April 16, 2010 and discharged her on April 28, 2010.  Bongard approved

10  and signed her declaration (she apparently did not write it herself) on May 1, 2010. (Bongard

11  Decl. at p. 4.)  Blaj initiated this action in March 2009, and had almost a year to build a case

12  against Stewart; Bongard should have been tracked down sooner than she was.  The Court

13  does not overlook Bongard's testimony lightly.   The accusation that Tran's violation of

14  Stewart's policies was frequent and open is a weighty piece of evidence, and would give rise

15  to precisely the kind of conflicting testimony that the Court has no commission to adjudicate

16  on summary judgment.  But the sparsity and timing of Bongard's testimony with respect to

17  Tran, coupled with the fact that Blaj never identified Bongard as a witness, convinces the

18  Court that her testimony is not entitled to meaningful recognition.

19      Finally, the Court must determine what to make of Blaj's allegation that, when first

20  confronted about a violation of the conflicts policy, she was told her conduct fell into a "gray

21  area" and that she would not be disciplined.  (Compl. ¶ 25.)  It's odd that this allegation,

22  critical as it is, doesn't make its way into Blaj's declaration that accompanies her opposition

23  brief.  Blaj's counsel attempted to have Stein corroborate it in his deposition, but counsel for

24  Stewart objected to the question and it wasn't put to Stein again. (Stein Dep. 22:1–6.) What

25  Stein did give up in his deposition was that Blaj asked him how she was supposed to know

26  her conduct created a conflict, and "I said, 'that's a good question, and maybe we need to

27  _____

28      [5]  Blaj is right that "[n]othing in the F.R.C.P. holds that a party cannot produce
     witnesses after the initial Rule 26 disclosures" (Doc. No. 44 n. 2) but this certainly isn't a
     license to spring new witnesses on an opposing party even after the *close of discovery*.

1   review this matter with all of family service.'" (Stein Dep. 22:17–23 and 24:14–17.)

2   Contrary to Blaj's allegation that she was told she would not be disciplined, Stein testified

3   that he told her she would not be terminated *that day*.  (*Id.* at 22:10–23.)

4        The ambiguity of Stewart's Employee Handbook as to the propriety of her conduct

5   arguably supports Blaj's account of her conversation with Stein, and the same can be said

6   of the deposition testimony noted above that gives the impression that *Stewart* wasn't even

7   sure whether Blaj's conduct violated its policies.  But it is telling to the Court that Blaj's

8   declaration doesn't repeat the "gray area" allegation and that her opposition brief doesn't rely

9   on it. (*See* Opp'n Br. at 9–11.) Moreover, Stein's deposition testimony — the only testimony

10  that confronts the issue head-on — refutes the allegation.  The Court is therefore inclined

11  to disregard it.   In any event, even assuming it wasn't crystal clear that Blaj's conduct

12  violated Stewart's policies, to Stewart or to Blaj, Stewart is still entitled to reach the

13  conclusion that it did and to terminate Blaj as a result.  This doesn't show that Stewart's

14  stated reason for terminating Blaj was a pretext for discrimination as much as it says that

15  Stewart's decision was simply unfair.  And Blaj needs to show more than that.

16              **4.    Discussion**

17        By the above analysis, the Court concludes that only two pieces of evidence are

18  relevant to the question whether Stewart's stated justification for terminating Blaj was a

19  pretext for discrimination.  The first is the fact that before she fell ill, and particularly in the

20  years 2005-2007, Blaj was a successful and recognized salesperson for Stewart.  The

21  second is that another Stewart employee, Rebecca Melendez, received only a verbal

22  reprimand for her role in the prohibited transaction Blaj engaged in — although Melendez's

23  role was minor and subservient to Blaj's, and she had not been previously disciplined.

24        "To survive summary judgment, plaintiffs must introduce evidence sufficient to raise

25  a genuine issue of material fact as to whether the reason the employer articulated is a

26  pretext for discrimination."  *Lee v. Eden Med. Ctr.*, 690 F.Supp.2d 1011, 1023–24 (N.D. Cal.

27  2010).  This evidence must be both specific and substantial.  *Steckl v. Motorola, Inc.*, 703

28  F.2d 392, 393 (9th Cir. 1983).  It must be enough for a reasonable jury to return a verdict in

Blaj's favor.  *Anderson*, 477 U.S. at 248.  Having considered all of the evidence produced by Blaj, and reduced it to the two pieces worth even considering as Blaj's rebuttal to Stewart's stated justification for her termination, the Court does not believe Blaj has a plausible claim of *disability discrimination* worth sending to a jury.   The emphasis is intentional, because it bears repeating that however *unfairly* or *harshly* Blaj believes she was treated by Stewart, it is another matter altogether to allege that her medical condition and related disability were the reason for the treatment.   The Court does not believe that Stewart's treatment of Melendez or Blaj's past performance as a salesperson, independently or cumulatively, allow for the conclusion that Blaj was terminated on account of her medical condition.   The fact that Stewart retained Melendez despite her involvement in the transaction for which Blaj was terminated doesn't say much considering that Melendez had no prior disciplinary record and played a minor role.   Likewise, the fact that Blaj was a prominent member of Stewart's sales staff at some point in the past does not allow for the conclusion that Stewart was moved to terminate her employment by her medical condition; this would be more helpful if Stewart alleged that Blaj was an underperformer in her sales capacity, but Stewart's stated justification for terminating Blaj had nothing to do with her performance.  It had to do with her observance of company policies.

The Court doesn't reach this decision lightly.  Very little evidence is required to survive summary judgment in a discrimination case, "because the ultimate question is one that can only be resolved through a 'searching inquiry'–one that is most appropriately conducted by the factfinder, upon a full record."  *Lam v. Univ. of Hawaii*, 40 f.3d 1551, 1563 (9th Cir. 1994). But the Court is also mindful that "[i]n some cases, an injustice can result simply from allowing an unmeritorious case to proceed to trial."  *Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1174 (9th Cir. 2003).  This is just that kind of case.

A jury *could* return a verdict in Blaj's favor on her discrimination claim, but that verdict could not possibly be based on the evidence she presented at trial; it would be based, instead, on the fact that Blaj told a compelling story and presented as a sympathetic plaintiff. If the Court were to send this claim to a jury, in other words, it would do so only on the

1  thinking that anything can happen at trial and by waving away the firm principle that a

2  nonmoving party cannot defeat summary judgment "with unsupported conjecture or

3  conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 112 (9th Cir.

4  2003). Blaj has not produced enough evidence to convince a reasonable trier of fact that

5  Stewart  discriminated against her on the basis of her medical condition.  Stewart's motion

6  for summary judgment on Blaj's FEHA claim is therefore **GRANTED**.

7  **V.    Blaj's ERISA Retaliation Claim**

8          ERISA creates a right to be free from retaliation for the exercise of substantive

9  guaranteed elsewhere in the statute.  29 U.S.C. § 1140.  Specifically, section 510 of ERISA

10 provides in pertinent part:

11              It shall be unlawful for any person to discharge, fine, expel,
                discipline, or discriminate against a participant or beneficiary for
12              exercising any right to which he is entitled under the provisions
                of an employee benefit plan . . . or for the purpose of interfering
13              with the attainment of any right to which such participant may
                become entitled under the plan."
14

15 29 U.S.C. § 1140.  "[E]very federal court of appeals to have addressed the question has

16 demanded a showing of specific intent in ERISA retaliation cases."  *Kouvchinov v.*

17 *Parametric Tech. Corp.*, 537 F.3d 62, 67 (1st Cir. 2008).  The analytical framework for

18 ERISA retaliation claims is the now-familiar burden-shifting framework for adjudicating

19 discrimination claims.  *Id.*  This explains Blaj's claim that "the same evidence that Blaj is

20 using to show medical condition discrimination also suggests retaliatory firing under ERISA."

21 (Opp'n Br. at 15:1–2.)

22         Although the Court has concluded Blaj has insufficient evidence that she was

23 discriminated against on account of her medical condition, it reaches a different conclusion

24 with respect to her ERISA claim.  The claim does lack precision, as the Court has noted, but

25 on the evidence in the record, it is far easier to believe that Stewart found Blaj to be a pest

26 based on her benefit needs and demands than it is to believe the company had something

27 against her because of her medical state.  The fact is that Blaj's attempt to have CIGNA

28 cover her ongoing care at Scripps was acrimonious and seemingly endless, and the parties

tell conflicting stories about their respective roles and duties.  It would not be unreasonable

1    for a jury to conclude that Stewart developed some animosity toward Blaj as a result of her

2    attempts to obtain coverage under its health insurance plan, and that this animosity

3    manifested itself in the decision to terminate her employment.

4         It's true that Blaj doesn't have more or better evidence to support her ERISA claim

5    than her wrongful discharge claim, and the Court stands by its reasons for finding the

6    evidence insufficient to establish a violation of the FEHA.  The difference is that Blaj's prima

7    facie case for a violation of ERISA is comparatively strong and manifestly more believable,

8    and the Court must consider the strength of that case in determining whether summary

9    judgment is ultimately appropriate.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S.

10   133, 143 (2000); *see also Balkenbush v. Ortho Biotech Products, L.P.*, 653 F.Supp.2d 1115,

11   1121 (E.D. Wash. 2009).

12   **VI.    Failure to Accommodate**

13        Blaj's final claim, which she brings under the Fair Employment and Housing Act,

14   alleges that Stewart failed to accommodate her medical condition.  (Opp'n Br. at 1:9–11.)

15   This claim is legally distinct from her wrongful termination claims, and, problematically, Blaj

16   asserts it for the first time in her opposition brief.  (*See* Opp'n Br. at 10:26–11:22.)  There is

17   no need, however, to dwell on points of procedure and debate whether to allow Blaj to

18   amend her complaint, because she pleads *no* facts that can lend support to this claim.

19   Instead, she notes that employers have an affirmative and impromptu duty to accommodate

20   workers with known medical conditions (Opp'n Br. at 10:26–27), and then accuses Stewart

21   of a "complete failure to engage in any process of reasonable accommodation" (Opp'n Br.

22   at 11:20).  It may be that employers have an affirmative duty to accommodate medically

23   disabled employees, but a claim can't stand unless the employee can point to some

24   particular accommodation that she sought and/or required and that was denied to her.

25        The best Blaj can do is say that Stewart made no attempt "to determine if her medical

26   condition was in any way related to the issues that led to her termination," but it's implausible

27   that Blaj's medical condition led her to violate Stewart's conflicts policy, or that a reasonable

28   accommodation would have been to exempt her from observing the policy.  (*See* Opp'n Br.

1  at 11.)  Regardless, Blaj pleads no facts that could form the beginning of an argument.  With

2  only the conclusory and vague allegation that Stewart failed to accommodate Blaj's medical

3  condition, Stewart's motion for summary adjudication of Blaj's failure-to-accommodate claim

4  is **GRANTED**.

5  **VII.    Romero's Discharge**

6         Finally, the Court comes to Romero's wrongful discharge claim, which is predicated

7  on her association with Blaj.  Under California law, it is unlawful for employers to discriminate

8  against employees on the basis of certain protected characteristics, and it is also unlawful

9  to discriminate against employees because of their association with a person who has those

10 characteristics.  Cal. Gov. Code § 12926(m).

11        Stewart explains that it terminated Romero — or, more precisely, eliminated her

12 position — as part of a reduction in force.  (Stein Dep. 121:–23.)  Romero's rebuttal to this

13 is that only two other Stewart employees were also targeted as part of this reduction, and

14 both were reassigned to other positions.  (Stein Dep.  126–127.)  It may be, as Romero

15 asserts, that she was an excellent employee who wore many hats at Stewart, and that she

16 could have easily transitioned to another opening within the company, but this is not enough

17 to defeat summary judgment.  Stewart is well within its rights to reassign other employees

18 and not Romero, so long as her relationship to Blaj has nothing to do with it.  Romero

19 perhaps makes a compelling case that it was unwise of Stewart to terminate her

20 employment, unfair even, but she offers insufficient evidence to suggest that Stewart was

21 motivated to rid itself of Romero because of her relationship to Blaj.  *See Matsushita Elec.*

22 *Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) ("some metaphysical

23 doubt as to material facts" insufficient to avoid summary judgment).  Stewart's motion to

24 dismiss Romero's wrongful discharge claim is **GRANTED**.

25 //

26 //

27 //

28 //

**VIII.    Conclusion**

The Court does not dismiss claims lightly, especially in a case of this nature.  But after a thorough review of the evidence and consideration of the parties' respective arguments, it cannot but reach the conclusion that, at best, Blaj can show that Stewart terminated her in retaliation for exercising certain rights under an ERISA plan.  Stewart's summary judgment motion is **GRANTED** as to all claims but this one.

**IT IS SO ORDERED**.

DATED:  November 23, 2010

**HONORABLE LARRY ALAN BURNS**
United States District Judge

09cv0734